UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
ASHLAND DIVISION

*ELECTRONICALLY FILED*

| | |
|---|---|
| KEVIN W. BROWN, ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| v. ) | CIVIL ACTION NO: _____ |
| ) | |
| ) | |
| ARCH WOOD PROTECTION, INC.; ) | **Complaint** |
| OSMOSE, INC.; CHEMICAL ) | |
| SPECIALTIES, INC.; ) | Plaintiff Demands Trial by Jury |
| KOPPERS, INC.; LANGDALE ) | |
| PRODUCTS COMPANY; and ) | |
| T.R. MILLER MILL COMPANY, INC. ) | |
| ) | |
| *Defendants.* ) | |

Comes now the Plaintiff, Kevin W. Brown, and for his cause of action against the Defendants, Arch Wood Protection, Inc.; Osmose, Inc.; Chemical Specialties, Inc.; Koppers, Inc.; Langdale Forest Products Company; and T.R. Miller Mill Company, Inc., with his Complaint, and respectfully states the following in support of his cause of action against the Defendants:

1. The Plaintiff, Kevin Brown, resides at 198 Pinnacle Hts., Flatwoods, Kentucky.

2. The following companies manufactured the arsenic-based pesticide known as Chromated Copper Arsenate (CCA), which is used as a preservative to treat the utility poles and cross-arms:

    a. The Defendant, Arch Wood Protection, Inc. ("Arch") (previously

       known as Koppers Company, Inc. until 1989 and Hickson Corporation until 1999), which is headquartered at 5660 New Northside Dr., Suite 1100, Atlanta, Georgia 30328.

   b.   The Defendant, Osmose Inc. ("Osmose"), which is headquartered at 980 Ellicott Street, Buffalo, New York 14209.

   c.   The Defendant, Chemical Specialties, Inc. ("CSI"), which is headquartered at 5910 Pharr Mill Road, Harrisburg, North Carolina 28075.

3.   During the time period of approximately 1981 to 2013, the following wood treating companies purchased the CCA preservative from Arch, Osmose and CSI to treat utility poles and cross-arms, which were sold to Plaintiff Kevin Brown's, employer, Kentucky Power Company ("Kentucky Power"), in Ashland, Kentucky:

   a.   The Defendant, Koppers, Inc. ("Koppers"), which is headquartered at 436 Seventh Avenue, Pittsburgh, Pennsylvania 15219.

   b.   The Defendant, Langdale Forest Products Company ("Langdale"), which is headquartered at 1202 Madison Highway, P.O. Box 1088, Valdosta, Georgia 31603.

   c.   The Defendant, T.R. Miller Mill Company, Inc. ("T.R. Miller"), which is headquartered at P.O. Box 708, Brewton, Alabama 36427.

4.   Arsenic is in the CCA treated utility poles and cross-arms. Arsenate is

synonymous with arsenic.

5. With callous disregard for the safety of end users, the Chemical Manufacturers, Arch, Osmose, and CSI used the deceptive terminology "salt-treated wood", "pressure-treated wood", and "green wood" to describe the CCA treated wood which contains arsenic.

6. The arsenic used to treat the CCA treated poles and cross-arms is toxic and a biocide. It is also a sensitizer, oncogenic, and a proven human carcinogen. The chromium is toxic, a sensitizer, and a probable human carcinogen. The copper is toxic and can enhance the toxic effects of arsenic.

7. Leaching of copper, chromium, and arsenic must occur in order for the treated wood to be toxic to the destructive organisms it is being protected against.

8. Burning CCA treated utility poles and cross-arms produces arsine in the smoke.

9. Burning CCA treated utility poles reduces pentavalent arsenic to the more toxic trivalent form which is released in the smoke and ashes.

10. Significant exposure to arsenic can occur as a result of indoor and outdoor exposure to CCA treated wood dust generated by sawing and drilling.

11. The open burning of CCA-treated wood can lead to significant air emissions of the more toxic trivalent form of arsenic in particle sizes that

are respirable.

12. Kevin Brown worked for Kentucky Power on the line crew as a pole climber from April 1, 1981 to the present date.

13. The Plaintiff, Kevin Brown, was poisoned by exposure to chromium, copper, and, in particular, arsenic released from CCA treated utility poles and cross-arms while employed by Kentucky Power.

14. Mr. Brown was exposed to arsenic, chromium, and copper on and in CCA treated wood for thirty-two (32) years by handling, sawing, and drilling the CCA treated wood as a part of his employment. Mr. Brown used chainsaws to saw the CCA treated wood. Mr. Brown used electric, gas-powered, and pneumatic drills to drill the CCA treated wood. In addition, Mr. Brown was exposed to arsenic, chromium, and copper as a result of fighting and extinguishing hundreds of fires on CCA treated utility poles as part of his employment.

15. Knowing there were health risks from exposure to arsenic on and in CCA treated wood, including utility poles and cross-arms, and with total disregard for the health and safety of users of CCA treated wood, the Chemical Manufacturers, Arch, Osmose and CSI, denied that exposure to arsenic caused by handling, sawing, sanding, drilling, and burning CCA treated wood constitutes a health hazard.

16. Arch, Osmose and CSI never described or issued a warning about the nature and extent of the known health hazards caused by exposure to

4

the release of arsenic from CCA treated utility poles and cross-arms by handling, sawing, sanding, drilling, and burning.

17. At all relevant times herein, Arch, Osmose and CSI knew the release of arsenic from CCA treated wood, including utility poles and cross-arms, is caused by leaching, handling, sawing, sanding, drilling, and burning and furthermore, that the release of the arsenic presents an imminent threat of endangerment to human health and the environment.

18. Arch (formerly Koppers Company, Inc.) knew there were three reports of injuries caused by arsenic in treated wood. These reports of injuries that occurred in 1968, January 1977 and July 1977 were documented on July 25, 1977 in a Koppers Memorandum on "CCA Dust Toxicity". As of August 1977, Osmose knew about the same injuries that occurred in January 1977 and July 1977.

19. In August 1977, the Chemical Manufacturers, Arch and Osmose, made fraudulent representations to the U.S. Environmental Protection Agency (U.S. EPA) about the safety of CCA treated wood. The fraud perpetrated on the U.S. EPA was a fraud on the end-users of CCA treated wood. The circumstances constituting the fraud are as follows: (1) as of July 25, 1977, Arch and Osmose knew there were reports of injuries caused by handling, sawing and machining CCA treated wood; and (2) a month later in August of 1977, Koppers Company, Inc. (predecessor of Arch) and Osmose filed a Memorandum with the Office of Pesticide Program, U.S.

5

EPA, on Arsenical Wood Preservatives in which they falsely and fraudulently stated "Inorganic pentavalent arsenical compounds of varying formulation have been used as wood preservatives in substantial quantities for more than 35 years with no reports of injuries." The August, 1977, Memorandum to the U.S. EPA intentionally failed to describe the documented reports of injuries caused by arsenic in treated wood described in the July 25, 1977, Koppers Memorandum on CCA Dust Toxicity.

20. On June 10, 1981, the Chemical Manufacturers, Arch and Osmose, submitted a response to the proposal of the U.S. EPA pursuant to the Toxic Substances Control Act (TSCA) which authorized the circulation of warnings for treated wood products including CCA treated wood. Arch and Osmose falsely asserted:

> The proposed TSCA warnings rule ignores the great specialization in treated wood products and markets. The railroads, utility companies, and marine contractors who are the major customers for railroad ties, utility poles, and marine piling and who use the great majority of treated wood have extensive experience in the use and handling of treated wood, their own safety and industrial hygiene programs and no need for the proposed precautions. Requiring labels with treated wood shipped to these users would be expensive overregulation.

This communication to the U.S. EPA was prefaced by Arch and Osmose with the false representation that treated wood does not present an unreasonable risk of injury to health or the environment.

6

21. With knowledge of the hazards of CCA treated wood, from 1981 to 1985, Arch, Osmose and CSI acted individually and in concert, and through trade organizations, including the American Wood Preservers Institute for Arch and the Society of American Wood Preservers for Osmose, and lobbied members of Congress with false and deceptive information to persuade the U.S. EPA to eliminate the proposed mandatory TSCA warning labels for CCA treated wood.

22. Based on the U.S. EPA's investigation of CCA treated wood and data generated in its 1978 Position Document No. 1; 1981 Position Document No. 2/3; and 1984 Position Document No. 4., Arch, Osmose and CSI and their trade organizations knew that permanent warning labels for all CCA treated wood were inexpensive, feasible, and necessary to prevent toxic effects to end users caused by exposure to the release of arsenic from CCA treated wood during its useful life of 50 years or more.

23. As of 1984, the Chemical Manufacturers, Arch, Osmose and CSI, had knowledge based on a peer reviewed medical article published by the Journal of American Medical Association that the parents and their six (6) children suffered adverse health effects including, eye irritations, bronchitis, lung congestion, headaches, blackouts, seizures, nosebleeds, alopecia, diarrhea, dermatitis, and sinusitis from burning scraps of CCA treated wood in their woodstove.  From 1984 to the present, Arch, Osmose and CSI negligently and willfully failed to warn end users about

7

these proven adverse health effects caused by burning.

24. As of 1986, the Chemical Manufacturers, Arch, Osmose and CSI, had knowledge based on a peer-reviewed medical article published by *Acta Pharmacologica et Toxicologica* that a female and male carpenter constructing picnic tables from what they thought was "salt treated wood" but was in reality CCA treated wood using a radial arm saw, band saw, drill press, and hand drill in a non-ventilated room with an overhead space heater suffered toxic effects including spontaneous nosebleeds, heaviness of the chest, itching and burning of the skin, stomachache, hair loss, muscle spasms, darkening of the urine, severe tarry stools, shock and passing out, and massive melena requiring seven units of blood as a result of constructing the "salt treated" picnic tables for the U.S. Department of Agriculture-Forest Service in Monroe County, Indiana. The symptoms developed in 1983 after a few weeks of carpentry work and again in 1984 after a few weeks of carpentry work. As of May 10, 1985, Arch, Osmose and CSI acknowledged that, if the adverse health effects suffered by the carpenters were proven to be caused by exposure to arsenic, chromium, and copper released from the CCA treated wood, it could end of the existence of the CCA treated wood industry. From 1986 to the present, Arch, Osmose and CSI negligently and willfully failed to warn end users about these proven adverse health effects suffered by the two workers.

25. Arch, Osmose and CSI did not want warnings on the CCA treated wood because they knew if end-users understood the nature and extent of the hazards of exposure to arsenic on and in the CCA treated wood, the product would not be merchantable.

26. From 1981 to 1985, the Chemical Manufacturers, Arch and Osmose, and other entities, spent approximately four million dollars ($4,000,000.00) lobbying the U.S. Congress with false and deceptive information to persuade the U.S. EPA to abandon mandatory warnings for CCA treated wood.  The early stages of the five year lobbying effort were memorialized in a Memorandum dated October 8, 1981 from E. David Lewis to George K. Eliades of the Society of American Wood Preservers, which was a trade organization sponsored and financially supported by Osmose.

27. The Chemical Manufacturers, Arch, Osmose and CSI, falsely represented that CCA treated wood could be handled in the same manner as untreated wood and at all times relevant herein, Arch, Osmose and CSI knew that utility companies did not know the nature and extent of the known hazards of exposure to arsenic released from CCA utility poles.

28. In 2001, pursuant to an agreement between the arsenic wood treating industry and U.S. EPA, Enhanced End Tags with Handling and Use Site Precautions for hazards of exposure to arsenic were stapled on CCA treated wood sold at the retail level.  On July 27, 2001, Arch, Osmose, CSI,

Langdale, T.R. Miller and Koppers were informed by Scott Ramminger, President and CEO, of the American Wood Preservers Institute that if the Chemical Manufacturers and wood treaters wanted to put the Enhanced End Tag on their poles that it would be "fantastic". Notwithstanding the benefits to workers of putting this warning on utility poles, none of the defendants took any action to staple the Enhanced End Tag or place any other warning on the CCA treated utility poles.

29. Both before and after implementation of the Enhanced End Tag program on July 27, 2001, Arch, Osmose and CSI acted individually and in concert to prevent warnings about the hazards of exposure to arsenic on and in CCA treated utility poles and cross-arms from being stapled on CCA utility poles and cross-arms sold to Kentucky Power.

30. In 2002, subsequent to the institution of the Enhanced End Tag program, Arch continued to fraudulently conceal the hazards of arsenic in CCA treated utility poles by representing in advertisements for CCA treated utility poles and cross-arms that "Testing has indicated that in outdoor fires, smoke exposure from CCA treated wood is no more hazardous than the smoke from untreated wood." Furthermore, Arch has never retracted the statement.

31. The Chemical Manufacturers, Arch, Osmose and CSI, knew that the arsenic released from CCA treated wood splinters killed cells and caused infections including osteomyelitis, gangrene and amputations. The

Chemical Manufacturers, Arch, Osmose and CSI, never issued a warning that arsenic on and in an injected CCA treated wood splinter is a health hazard. The Chemical Manufacturers, Arch, Osmose and CSI represented only that "handling may cause splinters". With no reference to the hazards of arsenic, this is a half-truth, and thus fraudulent. This half-truth of the Chemical Manufacturers, acting individually and in concert, helped perpetuate the concealment of other serious health hazards caused by exposure to arsenic on and in CCA treated wood by handling, sawing, sanding, drilling and burning.

32. Plaintiff, Kevin Brown, sustained splinter injuries caused by the arsenic on and in CCA treated utility poles.

33. On October 19, 2012, Mr. Brown was diagnosed with adverse health effects consistent with significant exposure to arsenic from the CCA utility poles he handled, sawed, drilled, and extinguished fires. These health effects included: shortness of breath, sinusitis, bronchial cuffing, airway obstruction, fatigue, loss of concentration, and diffuse feelings with the need for psychosocial testing to test for cognitive or psychodynamic depression.

34. To conceal the known hazards, the Chemical Manufacturers, Arch, Osmose and CSI falsely and fraudulently represented that CCA treated wood can be handled in the same manner as untreated wood.

35. The Defendants, at all times relevant to Plaintiff's claims, knew, or should

have known, that warnings were necessary to protect Kevin Brown from the hazards of exposure to arsenic, chromium, and copper in the CCA preservative used to treat the poles and cross-arms, which is released by handling, sawing, drilling and burning.

36. The Defendants, at all times relevant to Plaintiff's claims, knew, or should have known, and failed to warn that CCA treated utility poles burn for long periods of time due to a phenomena referred to as "afterglow" which is caused by the heavy metals, arsenic, chromium and copper.

37. The Defendants, at all times relevant to Plaintiff's claims, knew, or should have known, that permanent warnings of the hazards of exposure to arsenic could be easily affixed to the CCA treated utility poles and cross-arms.

38. The Defendants negligently, willfully, and with reckless disregard for the health and safety of Plaintiff, Kevin Brown, failed to affix permanent warnings on the CCA treated utility poles and cross-arms that described the nature and extent of the proven hazards of exposure to the arsenic which the Defendants knew, or should have known, was toxic and carcinogenic.

39. There were no warnings on the CCA treated utility poles or cross-arms which described the nature and extent of the health hazards caused by exposure to arsenic, chromium, and copper resulting from sawing, drilling, handling, and the burning of the CCA treated utility poles.

40. When the CCA treated utility poles were delivered to Kentucky Power, the poles were often wet, which made the poles easier to climb and drill. The Defendants knew that particular warnings were necessary for the hazards of exposure to arsenic in CCA utility poles and cross-arms that had not thoroughly dried.

41. Each of the Defendants knew, or should have known, a warning label is and was necessary to inform users of CCA treated utility poles that arsenic is both on and in the CCA treated utility poles and cross-arms.

42. Knowing CCA utility poles treated in 1985 or earlier have a useful life of more than 50 years, and knowing that utility workers were at risk, the failure of the Defendants to put a permanent warning label on the CCA treated utility poles, including the universal symbol of a "Skull and Crossbones" with the words "DANGER" and "POISON," was a direct and proximate cause of the toxic effects caused by Mr. Brown's exposure to arsenic, chromium, and copper on and in the CCA treated wood from 1981 to 2013.

43. As of January, 1993, Arch, Osmose and CSI knew there was a preservative for Southern Yellow Pine that did not contain arsenic and chromium and failed to replace the CCA preservative with the safer alternative.

## COUNT I

### PRODUCTS LIABILITY

44. Plaintiff incorporates each and every allegation contained in Paragraphs

"1" through "43," including the subparts, by reference.

45. The wood treaters, Koppers, Langdale and T.R. Miller, purchased the CCA preservative that they used to treat the CCA treated utility poles and cross-arms from the chemical manufacturers, Arch, Osmose and CSI.

46. The CCA treated utility poles and cross-arms were defective and unreasonably dangerous in the following manner:

   a. Defendants failed to give reasonable warnings about the nature and extent of the hazards of exposure to CCA on and in the CCA treated utility poles and cross-arms;

   b. Defendants failed to give reasonably complete instructions on the proper use of the product;

   c. As of July 27, 2001 the Defendants were encouraged to and refused to staple the Enhanced End Tag on the CCA treated utility poles and cross-arms; and

   d. Defendants could have made permanent warning labels or instructions available to the Plaintiff, Kevin Brown, because Defendants knew or should have known the nature and extent of the hazards presented by arsenic, chromium, and copper on and in the CCA treated utility poles and cross-arms.

   e. As of 1993, the Defendants failed to replace the CCA preservative with a safer preservative that did not contain arsenic and chromium.

47. As a direct and proximate result of Defendants' defective and unreasonably dangerous product, Mr. Brown was poisoned by the arsenic, chromium and copper on and in CCA utility poles and cross-arms by using, handling, sawing and drilling the CCA treated wood, and by extinguishing CCA treated utility pole fires.

## COUNT II

## PUNITIVE DAMAGES

48. Plaintiff incorporates each and every allegation contained in paragraphs "1" through "47," including the subparts, by reference.

49. To conceal the hazards and to enhance sales of CCA treated utility poles and cross arms, Arch, Osmose and CSI acted individually and in concert to prevent warning labels from being affixed to the CCA treated utility poles and cross-arms, knowing that the warning labels on CCA treated utility poles and cross arms were necessary to safeguard utility workers, including Kevin Brown, from the proven hazards of exposure to arsenic on and in the CCA treated wood utility poles and cross-arms.

50. In July, 1984, the U.S. EPA proposed that under its authority of the Toxic Substances Control Act, treated wood including CCA treated wood should be labeled with warnings. On January 10, 1986, the EPA succumbed to the unconscionable and deceptive lobbying effort of Arch, Osmose and CSI and instituted the Voluntary Consumer Awareness Program in lieu of mandatory warnings under the Mandatory Consumer Awareness

Program.

51. In 2001, knowing the nature and extent of the hidden dangers of CCA treated wood caused by the release of arsenic by leaching, handling, sawing, sanding, drilling, and burning, Arch, Osmose and CSI employed scientists and physicians who falsely espoused the safety of CCA treated wood.

52. The acts and omissions of the separate Defendants, Arch, Osmose and CSI demonstrate a reckless and willful pattern of wanton and depraved indifference to the likelihood of harm to utility pole workers, including Mr. Brown, as a result of the known health hazards presented by exposure to arsenic on and in the CCA treated utility poles and cross-arms.

53. The acts and omissions of the Defendants, Arch, Osmose and CSI in failing to put warning labels on the CCA treated utility poles and cross-arms as described, *supra*, demonstrate a high degree of moral turpitude warranting the imposition of punitive damages.

WHEREFORE, Kevin Brown, requests judgment against Defendants for damages including:

a. Adverse health effects caused by Mr. Brown's exposure to the CCA on and in the CCA utility poles and cross arms from 1989 to 2013;

b. Past, present and future:

   i. Medical expenses;

  ii.  Lost income and earning capacity; and

  iii.  Physical pain and mental suffering suffered by Mr. Brown.

c.  Loss of breathing function suffered by Mr. Brown;

d.  Periodic examinations to detect skin cancer and internal cancers;

e.  Punitive damages against the separate Defendants, Arch, Osmose and CSI; and

f.  All other just and proper relief in the premises.

Signed at Louisville, Kentucky this 13th day of May, 2013.

        Respectfully submitted,

        s/ *Richard L. Masters*
        Richard L. Masters
        Attorney for Plaintiff
        MASTERS, MULLINS & ARRINGTON
        1012 South Fourth Street
        Louisville, Kentucky 40203
        502.582.2900/502.587.0931 (fax)
        lawsaver @aol.com