# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## NORTHERN DIVISION
## at ASHLAND

Civil Action No. 13-61-HRW

KEVIN W. BROWN,                                                    PLAINTIFF,

v.                          **MEMORANDUM OPINION AND ORDER**

ARCH WOOD PROTECTION, INC., et al.                        DEFENDANTS.

     This is a failure to warn products liability action wherein Plaintiff Kevin Brown, who works for a utility company, alleges he sustained harm from being occupationally exposed to toxic levels of arsenic contained in a chemical used to preserve the wood in utility poles on which he worked. [Docket No. 1]. The Court now has before it several fully briefed motions. Specifically, three chemical preservative manufacturer Defendants and three wood-treating company Defendants have filed *Daubert* motions challenging the admissibility of certain testimony of Plaintiff's experts, and these Defendants contend the exclusion of this testimony requires judgment be entered in their favor as a matter of law. [Docket Nos. 163, 164, 165]. In addition, Defendants have filed summary judgment motions arguing that Mr. Brown's products liability claim fails on the issue of product identification and that his employer's failure to properly train and warn him was the superseding cause of his injuries. [Docket Nos. 159, 162]. Certain Defendants have also filed summary judgment motions arguing that because Mr. Brown's expert on warnings admitted his opinion was not directed

to the chemical manufacturers and Defendant Langdale, Plaintiff cannot establish his failure to warn claim against them. [Docket Nos. 160 and 161].

Mr. Brown also has dispositive motions pending. Specifically, Mr. Brown filed two summary judgment motions arguing that he is entitled to judgment as a matter of law on two issues: that he suffered cacosmia[1] as a result of his exposure to the arsenic in the chemical used to treat utility poles; and that two of the chemical manufacturers failed to warn of the hazards caused by splinters from wood treated with the chemical. [Docket Nos. 154 and 157]. In addition, after the close of all discovery and the filing of dispositive motions, Mr. Brown moved for an order compelling initial disclosures by the Defendants, specifically insurance policies from 1985 to the present.[2] [Docket No. 189].

In considering these various motions, the Court finds its ruling in *Stevens v. Arch Wood Protection*, 0:12-cv-46-HRW, 2016 WL 5660362 (E.D. Ky. Sept. 28, 2016) is directly on point. The plaintiff there alleged his decedent was harmed from his exposure to the chemical used to preserve the wood in the utility poles on which he worked. This Court held defendants were entitled to judgment as a matter of law because plaintiff failed to present sufficient evidence supporting a reasonable inference that plaintiff's decedent was exposed to the defendants' products. Further, plaintiff had not established the requirements to support

---

[1] Dr. Timothy Allen testified that cacosmia is "a disordered sense of smell in which typically normal or pleasant smells are interpreted as offensive or noxious." [Docket No. 157-11, pg. 4]. Dr. Christopher Allen similarly defined it as an "aversion to smells that typically are perceived as pleasant." [Docket No. 163-2, pg. 22].

[2] This Motion is not directed at Chemical Specialties, Inc. as it provided Plaintiff with the information he requested.

his concert of action theory against the two chemical-manufacturing defendants involved in that case.

As explained below, Mr. Brown's claims suffer from the same deficiencies. That is, Mr. Brown has not pointed to any evidence supporting a reasonable inference that he was exposed to any of these Defendants' specific products. Nor has he raised any issues of fact on his concert of action theory. Thus, for the reasons more fully set forth below, the Court will grant Defendants' Motion for Summary Judgment on Product Identification. [Docket Nos. 159]. Because lack of product identification is dispositive of the case, the parties' respective challenges on causation, failure to warn and Plaintiff's opinion testimony are moot, as is Plaintiff's Motion seeking to compel initial disclosures.

## I.    FACTS[3]

Mr. Brown alleges that during his employment at Kentucky Power Company (Kentucky Power) he was exposed to arsenic, chromium and copper contained in the chromated copper arsenate (CCA) chemical compound used to preserve the wood in utility poles and cross-arms. [Docket No. 1, ¶¶ 13-14, 47 and Deposition of Kevin Brown, Docket No. 159-2, pgs. 20, 34-37]. Mr. Brown began working for Kentucky Power in 1981 and is still so employed. [Docket No. 159-2, at pgs. 7, 47]. He began his career on the line crew with Kentucky Power's Ashland Division, and he remained on the line crew until

---

[3] This factual summary is taken in large part from those set forth in Defendants' Motion because Plaintiff has "accept[ed] the Statement of Undisputed Facts of the Joint Defendants in their Motion for Summary Judgment on Product Identification." [Docket No. 168, pg. 3].

approximately 2003 or 2004. [Docket No. 159-2, pgs. 47-48]. In addition to building new facilities, line crews at that time had the responsibility for extinguishing pole fires.[4] [*Id.* and Docket No. 159-3, pgs. 3-4]. Mr. Brown moved from the line crew to a servicing position in 2003 or 2004. [Docket No. 159-2, pg. 63]. In his servicing position, Mr. Brown still climbs poles, including CCA-treated poles, but rarely, if ever, fights pole fires.[5] [*Id.* at pgs. 8, 18, 63].

Mr. Brown alleges he was diagnosed with "adverse health effects consistent with significant exposure to arsenic from the CCA utility poles he handled, sawed, drilled, and extinguished fires [on]." [Docket No. 1, ¶ 33]. Mr. Brown testified his adverse health effects include shortness of breath, fatigue, burning eyes, sensitivity to smells, numbness and tingling in his hands and feet, stiff joints in his neck, hip, ankles and knees, lower back pain and scarring from splinters.[6] [Docket No. 159-2, pgs. 4-6, 8-19, 29-30]. Mr. Brown stated he believes his health ailments are all caused by his exposure to the chemicals contained in

---

[4] Mr. Brown explained pole fires were generally caused by a cutout or insulator failure on the pole, but could also be caused by lightning. [Docket No. 159-2, pgs. 54-55, 61]. Over the years, pole fires have become less frequent due to the installation of a new epoxy-style cutout on the poles and preventative maintenance. [*Id.* at pgs. 61, 63].

[5] Mr. Brown testified that in the last several years, he has not had to address a pole fire because servicemen now call the fire department to put out the fires. [Docket No. 159-3, pg. 63].

[6] While Mr. Brown alleged in his Complaint that he also suffered from a "loss of concentration and diffuse feelings with the need for psychosocial testing to test for cognitive or psychodynamic depression" [*see* Docket No. 1, pg. 11 ¶ 33], he stated in his Response to the Joint Motion to Exclude the Testimony of C. Christopher Allen and for Summary Judgment on Cognitive Impairment and Cacosmia that he is not asserting a separate claim for cognitive impairment. [Docket No. 173, pg. 41].

CCA-treated utility poles, and he places specific emphasis on the arsenic in the CCA.[7] [*Id.* at pgs. 20, 26-27, 29-32].

Mr. Brown filed this action against three producers of CCA (the chemical-manufacturing Defendants: Arch Wood Protection, Inc. (Arch), Osmose Inc. (Osmose), and Chemical Specialties, Inc. (CSI)) and three purchasers of CCA who used it to treat utility poles (the wood-treating Defendants: Koppers, Inc. (Koppers), Langdale Forest Products Company (Langdale), and T.R. Miller Mill Company, Inc. (T.R. Miller)). [Docket No. 1, ¶¶ 2-3]. Plaintiff claims that Defendants knew of the health hazards caused by CCA exposure, but failed to warn of these dangers. [*Id.* at ¶¶ 15, 17-18, 24, 31, 35-38, 46, 47, 49, 52].

Defendants Arch, CSI, and Osmose admit in their respective Answers that they manufactured CCA and sold it to certain of the wood-treating Defendants. [Docket Nos. 48, pgs. 1-2; 49, pgs. 1-2 and 51, pgs. 1-2]. Defendants Koppers, Langdale, and T.R. Miller admit that they purchased CCA preservative from Arch, Osmose or CSI to treat utility poles they sold to Kentucky Power. [Docket Nos. 38, pgs. 3-4; 50, pg. 2 and 52, pg. 2]. Specifically, Koppers and T.R. Miller admit they bought CCA from Arch. [Docket Nos. 50,

---

[7] In his Response, Mr. Brown explains that "[t]he product at issue in this case is arsenic. Specifically, the product is inorganic arsenic in the forms of: (1) pentavalent arsenic; and (2) trivalent arsenic. . . . Pentavalent arsenic was used to treat the kiln-dried southern yellow pine utility poles. Pentavalent arsenic converted to the more toxic form of trivalent arsenic when the utility poles were burned." [Docket No. 168, pgs. 1-2].

pg. 2 and 52, pg. 2]. Defendant Langdale admits it bought CCA from CSI and Osmose. [Docket No. 38, pg. 3].

The wood-treating Defendants contend, and Plaintiff does not dispute, that while they sold CCA-treated poles to Kentucky Power, they were not the only pole suppliers to Kentucky Power. Defendants presented records demonstrating that Kentucky Power purchased poles from at least seven other suppliers from 1992 to 2003. [Docket Nos. 159-4]. Further, testimony was provided that there is no way to know where any particular pole purchased by Kentucky Power is installed. [Deposition of Timothy Weinmann, Docket No. 159-5, pg. 19].

Mr. Brown explained in his Answers to Kopper's First Set of Interrogatories that while employed with Kentucky Power he has been exposed to arsenic, chromium and copper in CCA-treated utility poles through handling, drilling, sawing and climbing the poles. [Docket No. 159-6, pgs. 12-13]. He also stated he inhaled smoke while drilling the poles and while putting out fires on the poles. [*Id.*]. Mr. Brown stated his exposures occurred in Kentucky Power's Ashland Service Area, and he also mentioned he worked storm restoration for other utility companies outside the area. [Docket No. 159-6, pgs. 12-13].

Mr. Brown testified that he attended hundreds of pole fires over the years, but he has not made any effort to identify the specific poles on which he fought fires. [Docket No. 159-3, pgs. 8, 55; *see also* Plaintiff's Objections and Responses to Defendant Kopper's First Requests for Admissions, Docket No. 159-7, pg. 4 (Mr. Brown admitted he "ha[s] not

identified any specific utility pole that caused [his] alleged illness(es) in this lawsuit.")]. Mr. Brown also testified that he did not have any documents identifying the poles on which he fought fires. [Docket No. 159-3, pg. 8].

Defendants state they took the depositions of 24 of Mr. Brown's co-workers, but none of them could recall a specific pole fire they worked with Mr. Brown. Defendants filed six depositions as being representative of the testimony provided.[8] [Deposition of Carl Davis, Docket No. 159-10, pg. 14 (did not recall working a pole fire with Brown, but "sure [he] probably did"); Deposition of Bill Fraley, Docket No. 159-11, pgs. 10, 12 (could not recall a specific pole fire Mr. Brown worked on, but recalled him working fires); Deposition of Lloyd Rayburn, Docket No. 159-12, pg. 8 (could not recall a specific pole fire he worked on with Mr. Brown, but assumes they did work fires together because they were on the same crew); Deposition of Tony George, Docket No. 159-13, pg. 14 (saw Mr. Brown fight a lot of fires from a bucket truck, but could not recall a specific pole fire); Deposition of George Johns, Docket No. 159-14, pgs. 7, 14 and 21 (could not recall encountering a pole fire with Mr. Brown, but probably did); Deposition of Phillip Tolliver, Docket No. 159-15, pg. 35 (no specific recollection of seeing Mr. Brown responding to a pole fire)].

Defendants seek summary judgment, arguing that because Mr. Brown has not produced any evidence he was exposed to their specific products, he cannot meet his burden

---

[8] Defendants did not file all 24 depositions in the record, but offered to do so upon the Court's request. [Docket No. 159-1, pg. 10 n.9]. Given the representative depositions provided and Plaintiff's acceptance of Defendants' presentation of facts, *see* Docket No. 168, pg. 3, the Court finds the additional depositions are not needed to adjudicate the pending Motion.

of proving any of the Defendants' products specifically were a substantial cause of his injuries. [Docket No. 159-1]. In response, Plaintiff does not point to any evidence of his exposure to Defendants' products specifically, but argues he is not required to do so. He instead maintains that under a concert of action theory, the burden shifts to Defendants to prove their product was not the cause of his injuries. [*Id.* at pgs. 7-8].

## II.    ANALYSIS

### A.    Standard of Review

Summary judgment is appropriate if the materials in the record "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). The evidence must be viewed in the light most favorable to the nonmoving party and all reasonable inferences must be drawn in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The moving party has the ultimate burden of persuading the court that there are no disputed material facts and that he is entitled to judgment as a matter of law. *Id.* Once a party files a motion for summary judgment properly supported by either affirmatively negating an essential element of the nonmoving party's claim or establishing an affirmative defense, "the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252.

**B.     Mr. Brown Has Not Presented Any Evidence Demonstrating That He Was Exposed to Defendants' Products Specifically.**

This Court set forth the applicable law on product identification for a Kentucky products liability claim in *Stevens,* 2016 WL 5660362, at **4-5, a case factually similar to the case at bar. Specifically, this Court explained:

> In Kentucky, as part of any products-liability claim, a plaintiff must tie his injury to the defendant's product. *Collins v. Ansell Inc.*, No. 3:98-cv-259-H, 2003 WL 22769266, at *2 (W.D. Ky. Nov. 19, 2003) [(citing *Holbrook v. W.A. Rose*, 458 S.W.2d 155, 158 (Ky. 1970)]; *see also In re Beverly Hills Fire Litig.*, No. 77-79, 1979 U.S. Dist. LEXIS 15403, at **8-9 (E.D. Ky. Nov. 14, 1979) (plaintiff must identify the product causing the harm and link it to a particular defendant); *In re Martin v. Cincinnati Gas & Elec. Co.*, No. 02-201, 2006 WL 6353627, at *1 (E.D. Ky. 2006) ("Within the context of asbestos litigation, as with product liability generally, a plaintiff must identify the injury-causing product and its manufacturer in order to survive summary judgment.") (citing *Roberts v. Owens-Corning Fiberglas Corp.*, 726 F. Supp. 172, 174 (W.D. Mich. 1989)). To that end, a plaintiff is required to show, for each defendant, that he was exposed to the defendant's product. *Cf. Lindstrom v. A-C Product Liab. Trust*, 424 F.3d 488, 492 (6th Cir. 2005), *see also Mannahan [v. Eaton Corp.*, No. 2013-CA-002005-MR,] 2016 WL 3887037, at **3-4 [(Ky. Ct. App. July 15, 2016) ("Simply put, the plaintiff must prove that the defendant supplied the product that caused the plaintiff's disease or injury.") (unpublished) (citing *Lindstrom*, 424 F.3d at 492) (the plaintiff is required to prove exposure to a "specific product" attributable to the defendant)].
>
> After a plaintiff proves his exposure to a defendant's product, he must then establish that the exposure to the product was a substantial factor in causing the harm. *Collins*, 2003 WL 22769266, at *3 (court found no evidence upon which a reasonable fact finder could conclude the substantial and proximate cause of plaintiff's harm was more likely than not her exposure to defendant's product); *see also Moeller v. Garlock Sealing Tech.*, 660 F.3d 950, 954 (6th Cir. 2011) (noting, under Kentucky law, a plaintiff is required to prove a defendant's conduct was a substantial factor in bringing about the harm and stating "[c]ausation requires a link between the specific defendant's conduct and the plaintiff's injuries"). The substantial factor test requires the Court "to

determine 'whether the evidence as to the facts makes an issue upon which the jury may reasonably differ as to whether the conduct of the defendant has been a substantial factor in causing the harm to the plaintiff.'" *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 92 (Ky. 2003) (citing *Deutsch v. Shein*, 597 S.W.2d 141 (Ky. 1980)); Restatement (Second) of Torts § 431(1)(a). While causation is generally a question of fact for the jury, it "should not go to the jury unless the inference of causation is reasonable: it must 'indicate the probable, as distinguished from a possible cause.'" *Martin v. Cincinnati Gas & Elec. Co.*, 561 F.3d 439, 443 (6th Cir. 2009) (quoting *Briner v. Gen. Motors Corp.*, 461 S.W.2d 99, 101 (Ky. 1970)).

*Stevens*, 2016 WL 5660362, at **4-5.

*Stevens* is directly on point. In *Stevens,* the plaintiff alleged his decedent, Mr. Stevens, who was Mr. Brown's co-worker, was harmed from his exposure to CCA used in the wood utility poles on which he worked. This Court held plaintiff failed to present sufficient evidence supporting a reasonable inference that Mr. Stevens was exposed to the defendants' products specifically, finding it fatal to plaintiff's products liability claim that he could not point to a single pole Mr. Stevens worked on that was supplied by one of the wood-treating defendants and he had not pointed to any evidence placing defendants' products in his immediate work environment. This Court held that "[m]erely stating that [d]efendants' products were somewhere at Kentucky Power was not sufficient to demonstrate their presence at the specific work sites where he worked." *Stevens*, 2016 WL 5660362, at **5-9. Plaintiff had not submitted sufficient evidence to permit a jury to reasonably infer that Mr. Stevens was exposed to defendants' particular products and thus he could not demonstrate their products were a substantial factor in causing Mr. Stevens's harm. *Id.* at *9. Thus, summary judgment was granted to defendants.

Mr. Brown's products liability claim suffers from the same product identification deficiency as *Stevens*–he has not identified a single pole that he worked on and thus cannot connect his injuries to any of the Defendants' products. Mr. Brown admitted he has not identified a specific pole that caused any of his illnesses. [Docket No. 159-7, pg. 4]. He also testified that while he could drive around and point out poles on which he fought fires, he has not made any effort to identify any such poles. [Docket No. 159-3, pg. 8]. Further, he testified he has no documents in his possession that indicate on which poles he fought fires. [*Id.*]. In addition, Plaintiff does not dispute that none of his 24 co-workers who were deposed were able to identify a specific pole on which he fought a fire. Nor has Mr. Brown pointed this Court to any other evidence, direct or circumstantial, that demonstrates he was, in fact, exposed to any of the Defendants' products.

While Mr. Brown does not make any argument trying to connect his injury to Defendants' products specifically, to the extent various factual statements in his briefing can be read as an attempt to raise sufficient facts from which a jury could infer he was exposed to Defendants' products, the statements are not sufficient to raise a permissible inference. As the plaintiff did in *Stevens*, Mr. Brown points generally to the fact that Kentucky Power bought utility poles from the wood-treating Defendants, which poles had been treated with the chemical-manufacturing Defendants' CCA. But Brown does not dispute that Kentucky Power also bought poles from at least seven other companies.

Further, while Plaintiff makes a statement in his Response that "evidence and reasonable inferences from the evidence establish that Kevin Brown was exposed to hundreds of utility poles that contained arsenic from Arch" and "[t]he same inference applies to all Defendants," he does not point to any actual evidence upon which the Court could make such reasonable inferences.[9] [Docket No. 168, pgs. 8-9]. Nor does Mr. Brown make any attempt to connect any of the Defendants' products to a specific exposure. It is well established that a party opposing a motion for summary judgment must present evidence supporting his claims—"conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment." *See cf. Jones v. City of Franklin*, 677 F. App'x 279, 282 (6th Cir. 2017) (citing *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

The only other facts raised by Plaintiff in his Response that arguably could be directed to product identification concern only Defendant Arch:

> Arch was the sole supplier of arsenic to T.R. Miller and Koppers. Arch was the only warrantor of the chromated copper arsenate utility poles. Arch was the self-proclaimed leader in the industry (50% of sales). Arch spent millions of dollars on marketing, which resulted in hundreds of millions of dollars in sales of Wolmanized® Brand Products. The circumstantial evidence and the inferences from the evidence establish that Arch supplied a substantial amount of the arsenic used to treat thousands [of] utility poles sold to Kentucky Power, to which Kevin Brown was exposed, beginning in 1985.

---

[9] It is not the role of this Court to scour the record for evidence in support of Brown's assertions. *See Emerson v. Novartis Pharm. Corp.*, 446 F. App'x 733, 736 (6th Cir. 2011) ("[J]udges are not like pigs, hunting for truffles' that might be buried in the record.") (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

[Docket No. 168, pg. 28]. Mr. Brown also states "the evidence and inferences from the evidence establish that Arch was a primary supplier of arsenic to other wood treaters who sold chromated copper arsenate utility poles to Kentucky Power."[10] [*Id.* at pgs. 27-28]. However, even assuming these statements to be true, they do not support an inference that Plaintiff was exposed to Arch's product or that its product was the substantial cause of his injuries.

Like the *Stevens* case, this case is analogous to *Collins* v. *Ansell, Inc.*, 2003 WL 22769266. In *Collins*, the Western District of Kentucky found the plaintiff's circumstantial evidence attempting to link the defendant latex glove manufacturer with her latex allergy was insufficient to withstand summary judgment where the attempted link was based on speculation. *Collins*, 2003 WL 22769266. The plaintiff admitted she had no evidence that she had direct contact with defendant's gloves, but argued that because the gloves had been supplied to her hospital employer and were used in the hospital (although in a different building), it was possible they had caused her injury by someone moving the gloves from place to place or by airborne contaminates. *Id.* at *2. The court noted plaintiff's theories did not have sufficient evidentiary foundation to sustain the reasonable inferences necessary to support them and, while possible, were mere speculation. *Id.* at *3. Thus, the fact that the defendant supplied gloves to the hospital and that they were used somewhere in the hospital

---

[10] Defendants argue these assertions are Mr. Brown's attempt to advocate for a market share theory. [Docket No. 175, pgs. 8-10]. But as Defendants note, Kentucky law does not recognize such a theory. *See Dawson v. Bristol Labs.*, Nos. 83-937L, 83-941L, 83-942L, 83-992L, 1988 WL 123929, at *1 (W.D. Ky. 1988) (Kentucky law does not recognize a market share liability theory to bridge the causation gap).

where plaintiff worked was insufficient, on its own, to demonstrate her injury more likely than not was caused by her exposure to defendant's product.[11]

Here, like *Collins*, Mr. Brown has only demonstrated that the wood-treating Defendants' products, along with those of at least seven other suppliers, were used by his employer. Also like *Collins*, Mr. Brown has not presented any evidence that he came into contact with or was exposed to any of the Defendants' products. Simply pointing to the fact that Defendants' products were used somewhere at Kentucky Power, without more, does not make it more likely than not that a wood-treating Defendant's CCA-treated utility poles, or a specific chemical-manufacturing Defendant's CCA, were a substantial factor in causing his injuries.

*Bryant v. Tri-County Electric Membership Corporation*, 844 F. Supp. 347 (W.D. Ky. 1994) is also instructive on the issue of product identification. In *Bryant*, the owners of a sawmill brought a claim against a manufacturer of electrical transformers, Kuhlman, arguing a 1988 fire that destroyed the sawmill was caused by a defect in transformers that were used at the sawmill prior to their removal in October 1986. *Id*. at 353-54. The owners maintained the transformers gradually caused damage to a switch, and the switch eventually exploded causing the fire. Kuhlman sought summary judgment, arguing plaintiffs had no evidence it

---

[11] The court withheld entering judgment on behalf of the movant latex manufacturer, however, because plaintiff was awaiting discovery from the multi-district litigation that she claimed supported causation. *Collins*, 2003 WL 22769266, at *3. Because the court was unsure if the additional evidence would prevent summary judgment, it permitted plaintiff additional time to obtain her evidence. In a later summary decision, the court noted plaintiff had not filed additional discovery or a supplemental memorandum, and entered summary judgment for the defendant glove manufacturer for the reasons stated in the prior decision. *See Collins v. Ansell, Inc.*, No. 3:98-cv-259, 2004 WL 524912 (W.D. Ky. Mar. 2, 2004).

manufactured the defective transformers. Plaintiffs admitted they did not have direct evidence Kuhlman manufactured the defective transformers, but argued the fact that Kuhlman was one of six manufacturers the electric company purchased transformers from in 1986 was sufficient to raise a question of fact as to whether the defective transformers were Kuhlman transformers. *Id.*

The court disagreed, finding that Kuhlman being one of a limited number of transformer manufacturers who supplied transformers to the electric company did not support an inference that Kuhlman manufactured the defective transformers at issue. The court held "Kentucky law simply does not permit a jury to hold a party liable on the strength of a one-in-six possibility that the party acted irresponsibly." *Id.* at 354. The court noted plaintiff offered no evidence of distinctive characteristics of the transformers that would allow a reasonable jury to decide they were made by Kuhlman as opposed to one of the five other manufacturers. *Id.* The court granted summary judgment for Kuhlman, finding plaintiffs could not identify Kuhlman as the manufacturer of the transformers that allegedly contributed to plaintiffs' injuries.

*Bryant* is analogous to the matter at hand. Kentucky Power purchased CCA-treated utility poles from at least ten suppliers from 1992 to 2003, but has no knowledge of where each pole purchased is located in its large network. Without direct or circumstantial evidence that Mr. Brown was exposed to any of the wood-treating Defendants' utility poles or to a specific chemical manufacturer's CCA, there is no basis to present this to a jury and permit

it to infer that exposure to any of Defendants' products was a substantial factor in the harm he sustained. "While reasonable inferences are permissible, a jury verdict must be based on something other than speculation, supposition or surmise." *See R & B Aircraft, Inc. v. ABG Ambulance Services*, 949 F.2d 397, 1991 WL 256705, at *4 (6th Cir. 1991) (table decision) (quoting *Huffman v. SS. Mary & Elizabeth Hosp.*, 475 S.W.2d 631, 633 (Ky. 1972)).

In conclusion, Mr. Brown has not pointed to any evidence that he handled, sawed, drilled or fought a fire on a wood-treating Defendants' CCA-treated utility pole or that he was otherwise exposed to a specific chemical-manufacturing Defendant's CCA. Kentucky Power's purchase of CCA-treated poles from the wood-treating Defendants, and its installation of those poles somewhere in its network, points only to a possibility that Mr. Brown worked on a pole supplied by one of the wood-treating Defendants. Further, even though Mr. Brown testified to instances of fighting pole fires, without evidence of who manufactured any of those poles, this evidence does not establish the probability that the poles involved in those fires were supplied by a wood-treating Defendant. Mr. Brown's failure to identify any specific poles that allegedly caused his injuries also precludes him from identifying the chemical-manufacturer(s) who supplied the CCA for those poles. Thus, to the extent Mr. Brown's briefing can be read as an attempt to set forth sufficient circumstantial evidence to permit a jury to reasonably infer that he was exposed to any particular Defendant's product, his attempt fails.

16

## C.  Concert of Action

The thrust of Mr. Brown's argument in response to Defendants' Motion for Summary Judgment on Product Identification is that under a concert of action theory, the burden shifts to Defendants to prove they are not responsible for his injury.[12] [Docket No. 168, pgs. 7-8]. A plaintiff may proceed under a concert of action theory to bypass the causation requirement if he can prove that the defendants acted tortiously pursuant to an agreement or common design or that they rendered substantial assistance to others to accomplish a tortious act. *Dawson*, 1988 WL 123929, at *3. Plaintiff points to documentary evidence that he alleges establishes that the Defendants, in various combinations, acted in concert to conceal the hazards of arsenic in CCA-treated utility poles. Mr. Brown's analysis as to how concert of action applies in this case, however, is often difficult to follow and/or understand. As explained more throughly below, the Court has reviewed his arguments and the evidence on which he relies, and finds Mr. Brown's presentation does not lead to a reasonable inference that the Defendants, in any combination, acted tortiously pursuant to an agreement or common design as Mr. Brown asserts.

As discussed in *Stevens*, Kentucky law recognizes a concert of action theory in products liability cases. *Farmer v. City of Newport*, 748 S.W.2d 162 (Ky. Ct. App. 1988).

---

[12] While Plaintiff alleged in his Complaint that the chemical-manufacturing Defendants acted in concert to conceal the dangers of arsenic in CCA-treated wood by failing to properly warn of its dangers, he did not make such allegations against the wood-treating Defendants. Nevertheless, the Court will consider Plaintiff's arguments as to all Defendants.

In *Farmer*, the Kentucky Court of Appeals applied the concert of action theory as set forth

in Section 876 of the Restatement (Second) of Torts:

> For harm resulting to a third person from the tortious conduct of another, one
> is subject to liability if he (a) does a tortious act in concert with the other or
> pursuant to a common design with him, or (b) knows that the other's conduct
> constitutes a breach of duty and gives substantial assistance or encouragement
> to the other so to conduct himself, or (c) gives substantial assistance to the
> other in accomplishing a tortious result and his own conduct separately
> considered, constitutes a breach of duty to the third person.

*Farmer*, 748 S.W.2d at 164 (quoting Restatement (Second) of Torts, § 876); *see also Smith*

*v. Univar USA, Inc.*, No. 12-134-ART, 2013 WL 1136624, at *5 (E.D. Ky. Mar. 18, 2013)

(granting motion to dismiss concert of action claim where plaintiff did not allege facts

demonstrating necessary elements for such a claim).

While Mr. Brown has not stated which provision he is relying on, his assertions appear

to fall under § 876(a) of the Restatement because he argues the Defendants, in different

combinations, acted in concert in various ways to conceal the known hazards of the arsenic

contained in the CCA. [Docket Nos. 168, pgs. 4-26]. Mr. Brown has not alleged facts or

pointed to documents that warrant the application of the other two subsections of the

Restatement. Specifically, he does not argue or point to evidence demonstrating any of the

Defendants provided substantial assistance or encouragement to others to accomplish a

tortious act.

Federal courts in Kentucky have applied three elements in analyzing concert of action

in products liability cases. *Stevens*, 2016 WL 5660362, at *10; *Eastridge v. Goodrich Corp.*,

No. 3:12-cv-862-S, 2014 WL 4916236, at *3 (W.D. Ky. Sept. 30, 2014); *Dawson v. Bristol Labs*, 658 F. Supp. 1036, 1039-40 (W.D. Ky. 1987); *In re Beverly Hills*, 1979 U.S. Dist. LEXIS 15403. These elements are:

> First, plaintiffs must identify the product causing the harm and prove that the defendants' acts in marketing and promoting the allegedly defective product were a substantial factor in causing the plaintiff's injuries . . . Second, plaintiffs must establish that the defendants acted by cooperative or concerted activities . . . Finally, plaintiffs must prove defendants contravened a particular standard of care.

*Eastridge*, 2014 WL 4916236, at *3 (quoting *Dawson*, 658 F. Supp. at 1038-40). Allegations of mere parallel activity of two or more defendants, without more, are insufficient to prove defendants acted by cooperative or concerted activities under the concert of action theory. *Smith*, 2013 WL 1136624, at *5; *Dawson*, 658 F. Supp. at 1039-40. To show concerted action, a plaintiff must point to evidence suggesting an agreement or common design between the defendants. *Smith*, 2013 WL 1136624, at *5; *Dawson*, 1988 WL 123929, at *3 (W.D. Ky. 1988).

Here, Mr. Brown states he has established the elements under a concert of action theory. Specifically, he explains:

> The Plaintiff, Kevin Brown, has satisfied the first element of the concert of action theory of liability outlined in the *Dawson* case. The product is inorganic pentavalent and trivalent arsenic. Arch, Osmose and CSI are the only manufacturers of the arsenic used by the wood treaters.

> The second factor in *Dawson* that the joint defendants acted in concert is satisfied.

19

> Kevin Brown has satisfied the third factor that Defendants have contravened
> a particular standard of care in failing to communicate adequate warnings
> about the nature and extent of the hazard of arsenic.

[Docket No. 168, pg. 8]. Mr. Brown contends there are three combinations of Defendants

who acted in concert: 1) Arch and Osmose; 2) Arch, Osmose, and CSI; and 3) all Defendants.

Mr. Brown attached 27 documents to his Response that he presumably contends satisfy these

elements and demonstrate Defendants, in the various combinations, acted in concert to

conceal the hazards of arsenic in CCA-treated wood by, among other things, failing to warn

of its known dangers.[13] [Docket No. 168].

Defendants respond that Mr. Brown has failed to establish the required elements of

concert of action. First, they argue that Mr. Brown ignores the first element requiring him

"to prove that the defendants' acts in marketing and promoting the allegedly defective

product were a substantial factor in causing [his] injuries." [Docket No. 175, pgs. 6-7]. They

also argue that Mr. Brown's conclusory statement that he has established that Defendants

acted in concert in failing to warn of the hazards of arsenic is also not supported by the

evidence. Defendants contend that they are and were competitors in their respective markets

and have independently marketed their products. Defendants contend that while they may,

at times, have overlapping interests, there is no evidence that they acted in concert to commit

a tortious act or that they provided substantial assistance or encouragement to others to

accomplish a tortious act.

---

[13] While Plaintiff's Response contains 28 exhibits, Exhibit J [Docket No. 168-10 and 170-1] is a duplicate of Exhibit L [Docket No. 168-12].

While Mr. Brown has not provided a specific analysis as to how the documents he cites support his argument that a concert of action theory applies in this case, the Court has, as it is required to do, carefully reviewed the evidence presented on this issue, viewed it in the light most favorable to Mr. Brown, and drawn all reasonable inferences in his favor. The Court has not, however, scoured the record for evidence to support Mr. Brown's arguments and assertions. *See Emerson*, 446 F. App'x at 735-36 ("a party opposing a motion for summary judgment must 'cit[e] to particular parts of materials in the record' . . . . it [is] not the district court's duty to track down those facts"). As discussed below, Mr. Brown's presentation fails to establish that the Defendants, in any combination, acted pursuant to an agreement or a common plan to conceal the hazards posed by the arsenic in the CCA-treated wood.

1.    **Plaintiff has not presented evidence demonstrating Arch and Osmose acted in concert to conceal the hazards of arsenic in CCA-treated wood.**

Mr. Brown specifically argues that Arch and Osmose acted in concert in concealing the dangers of arsenic in CCA-treated wood in two ways. First, he argues they "acted in concert in denying that arsenic is in [CCA-]treated wood." [Docket No. 168, pgs. 9-16]. Second, he argues these two Defendants "committed fraud in concealing the hazards of exposure to arsenic in splinters" from CCA-treated wood. [*Id.* at pgs. 9, 14-17]. In addition, while not expressly stating it is evidence of concert of action, Mr. Brown argues Arch and Osmose had representatives on a subcommittee of American Wood Preservers Institute

[AWPI] when the subcommittee in 1977 provided inaccurate information to the EPA that there were no reports of adverse effects from the use of various forms of inorganic pentavalent arsenic as a wood preservative. [*Id.* at pgs. 24-25]. As discussed below, Plaintiff has not pointed to any evidence that supports a finding that Arch and Osmose acted by agreement or in concert to commit a tortious act under any of these circumstances.

<blockquote>

**a.    Plaintiff has not presented evidence that Arch and Osmose acted in concert in denying that arsenic is in CCA-treated wood.**

</blockquote>

Mr. Brown argues Arch and Osmose acted in concert in concealing the hazards of arsenic by denying that arsenic is in CCA-treated wood. [Docket No. 168, pgs.9-14]. In support of this argument, Mr. Brown points to two documents: a June 16, 2000, Declaration of William J. Baldwin, the former vice-president of Arch's predecessor, Hickson Corporation,[14] which was filed in connection with a 2000 Lanham Act case brought in the Northern District of Georgia [*Id.* at pgs.10-11]; and a 1995 Material Safety Data Sheet (MSDS) of Osmose [*Id.* at pgs. 11-12].[15] As discussed below, these documents do not

---

[14] Mr. Robert Gruber, Arch's Director of Regulatory Affairs and Industry Relations, testified that in 1989, Koppers Company became Hickson Company ("Hickson"), and Arch purchased Hickson in 2000. [Deposition of Robert Gruber, Docket No. 178-13, pgs 5-6]. Defendants explain in their Reply that Koppers Company, Arch's predecessor, is not the same entity as Defendant Koppers, Inc. [Docket No. 176, pg. 5 n.5].

[15] Mr. Brown also makes reference to Defendants' statements in certain filings in a related case, *Manning v. Arch Wood*, No. 13-127-HRW-CJS. [Docket No. 168, pgs. 12-13). However, it is not clear what point Mr. Brown is trying to make with respect to his own case. He seems to be arguing that because the Defendants have filed joint motions in this and related cases, the representations of one Defendant, regardless of when made, are assumed to be accepted as the position of all. [*Id.* at pg. 13 ("With the filing of the Joint Motion, there is a presumption that all Defendants have 'no conflicts of interest' and accept the position of Arch and Osmose that [CCA]-treated wood does not contain arsenic but rather a 'benign in-wood preservative.'"). Plaintiff does not cite any authority for this "presumption." Nevertheless, even assuming all Defendants agree CCA does not contain arsenic, Plaintiff has not pointed to any evidence to demonstrate they reached this consensus by agreement or concerted activities.

support a reasonable inference that these two Defendants acted in concert to conceal the hazards of arsenic in CCA-treated wood.

In the Northern District of Georgia Lanham Act case, Hickson filed suit against a wood-treating company that sent an advertisement to retailers and distributors of CCA-treated wood, implying Hickson's product contained arsenic and that it, the advertiser, used a preservative that did not contain arsenic. *Hickson Co. v. Northern Crossarm Co., Inc.*, 235 F. Supp. 2d 1352, 1358-59 (N.D. Ga. 2002), *reversed in part,* 357 F.3d 1256 (11th Cir. 2004) (vacating summary judgment on Lanham Act claim, finding that while advertisement was not literally false, court overlooked evidence on whether the advertisement was literally true but misleading). Hickson argued that this advertisement was false and misleading in violation of the Lanham Act. In a declaration filed in that case, Mr. Baldwin stated that "Wolmanized® pressure-treated wood does not contain arsenic."[16] [Docket Nos. 168, pg. 10-14 (citing *Hickson Co.*, 235 F. Supp. 2d at 1358-59); 168-3]. Mr. Brown argues this contention was rejected by the judge in that case, who found the undisputed facts before him demonstrated that wood treated with Hickson's product did contain pentavalent arsenic. [Docket No. 168, pg. 14].[17]

---

[16] The court in *Hickson* explained that Hickson sold a brand of CCA that, upon being applied to wood, was known as "Wolmanized" pressure treated wood. *Hickson*, 235 F. Supp. 2d at 1355.

[17] The court's decision notes that Hickson explained its position regarding arsenic not being in its CCA-treated wood. While Hickson initially alleged that its CCA-treated wood did not contain arsenic, in response to defendant's motion for summary judgment Hickson clarified that its CCA-treated wood does not contain "arsenic as understood by lay persons, i.e., the white powdery poison." *Hickson*, 235 F. Supp. 2d at 1358-59. In reaching its findings that the evidence before it demonstrated the product contained pentavalent arsenic, the court did not specifically address Mr. Baldwin's declaration.

Mr. Brown argues "Osmose agrees with the Declaration of William J. Baldwin" and points to Osmose's 1995 MSDS, wherein it explains arsenic pentoxide is not in wood treated with its CCA. [*Id.* at pg. 11]. Specifically, in explaining why wood treated with Osmose's CCA does not require reporting of its storage and use to state authorities under the Superfund Amendment and Reauthorization Act of 1986 (SARA), Osmose stated in its MSDS:

> Title III of SARA requires companies to report to their state agencies the storage of specific chemicals stored in volumes equal to or greater than the Threshold Planning Quantity (TPQ). One of the specific chemicals is arsenic pentoxide.
>
> The MSDS for Osmose Brand Pressure Treated Wood clearly indicates that the product contains arsenic pentoxide. THIS IS INCORRECT but for a reason. Osmose Brand Pressure Treated Wood contains arsenic in the form of a chromium arsenate complex with the wood as a result of the fixation chemical reactions of chromated copper arsenate and wood.
>
> The MSDS refers to arsenic pentoxide because the AWPA Standard calls for the expression of chromated copper arsenate retention in the treated wood on the oxide basis, regardless of the form of chemicals used to formulate the chromated copper arsenate wood preservative. These chemical forms are always expressed on the oxide basis, i.e., . . . arsenic pentoxide (As20s). The arsenic as found in Osmose Brand Pressure Treated Wood is a chromium copper arsenate complex. However, in order to comply with the AWPA standards, the form of arsenic is merely expressed as the arsenic pentoxide equivalent on the MSDS.
>
> Since Osmose Brand Pressure Treated Wood does not contain arsenic pentoxide but rather a chromium arsenate complex, you are not required to report your storage of the same under Title III of SARA. However, if you want, you may do so . . . .

[Docket No. 168-4, pgs. 5-6].

24

Mr. Brown argues that Osmose's statements "compare[]" with Arch's description of its product, which Arch declared was "benign as compared to arsenic." [Docket No. 168, pg. 12]. Mr. Brown also states Baldwin's declaration and Osmose's 1995 MSDS reflect a "'state of mind' that knowingly conceals the hazard of arsenic," and he also emphasizes that Arch's predecessor's claim that its pressure-treated wood "does not contain arsenic is a bald-faced prevarication." [*Id.* at pgs. 13-14]. While not entirely clear, Mr. Brown seems to imply that because Arch's predecessor denied arsenic is in its CCA-treated wood and Osmose explained in an MSDS why arsenic pentoxide is a listed ingredient but did not require state reporting, both viewed by Plaintiff as acts to conceal that arsenic is in CCA-treated wood, they must have acted in concert. These documents, however, do not support such an implication.

Of note, in contrast to Mr. Baldwin's declaration, Osmose's 1995 MSDS does not state that no form of arsenic is in its CCA, but explains why state reporting is not necessary despite arsenic pentoxide being listed as an ingredient. Specifically, Osmose explains that state reporting is not necessary because the wood "contains arsenic in the form of a chromium arsenate complex," not arsenic pentoxide. Mr. Brown does not point to evidence demonstrating the 1995 Osmose MSDS was incorrect, other than relying on another court's factual finding in a 2000 Lanham Act case that the evidence before it in that case demonstrated that Hickman's Wolmanized® pressure treated wood contained pentavalent arsenic.

Further, Mr. Baldwin's declaration is dated almost five years after Osmose's MSDS and does not suggest Hickman had any communications with Osmose, let alone an agreement, regarding the representations made in this filing. Nor does either document suggest the two worked in concert in reaching their conclusions or in making their respective representations.

In fact, the purposes of the respective filings are completely different, and do not suggest that the parties had an agreement or common design between them in making their assertions. As discussed, Osmose was explaining why, despite the MSDS listing of arsenic pentoxide as an ingredient in its CCA, state reporting was not required. Mr. Baldwin, however, was explaining in the course of litigation why its competitor's advertisement that suggested Hickman's product contained arsenic was false. This evidence does not support a finding that Arch or its predecessor and Osmose had any interaction, let alone an agreement or common design, to deny that arsenic is in CCA-treated wood. At most, the evidence demonstrates Arch and Osmose may have made similar representations, which is insufficient to support a concert of action theory. *See Smith*, 2013 WL 1136634, at *5 (granting motion to dismiss concert of action claim, finding allegations of parallel activity were insufficient to state such a claim) (citing *Dawson*, 658 F. Supp. at 1040).

> **b.  Plaintiff has not pointed to evidence that demonstrates Arch and Osmose acted in concert in concealing the hazards of arsenic in splinters from CCA-treated wood.**

Mr. Brown argues Arch and Osmose "committed fraud" in concealing the hazards of arsenic in splinters from CCA-treated wood by their "use of the same half-truth in Health/Safety Alerts." [Docket No. 168, pgs. 9, 14-18]. Specifically, Mr. Brown argues that "[i]n obvious concert of action," Arch and Osmose included in their respective literature a warning that "handling may cause splinters," which he contends is a "half-truth," in order to conceal the hazards caused by the arsenic found in the splinters. [*Id.* at 14-16 (citing Docket Nos. 168-7 (1992 MSDS of Arch's predecessor) and 168-8 (Osmose's July 25, 1994 environmental newsletter)]. Mr. Brown asserts that this "half truth" amounts to fraud. He argues no warning was necessary for the obvious risk of getting a splinter from the wood, but that a warning was necessary, and not provided, for the hazard the arsenic in the CCA posed to a person getting a splinter.[18]

Despite Plaintiff's contention to the contrary, "the mere fact Arch and Osmose warned that handling CCA-treated poles may cause splinters, in and of itself, is not evidence that they acted in concert in formulating their respective warnings or in their decision not to provide different warnings on the hazards of splinters from CCA-treated wood. In fact, Arch's director of regulatory affairs and industry relations testified that the statement "handling may cause splinters" is the same cautionary statement contained on the MSDS for

_____

[18] Mr. Brown points to CSI's warnings for hazards caused by CCA splinters in its MSDS for 2001 and 2004 as examples of what he contends more accurately warn of the hazards of splinters caused by the arsenic in the CCA. The mere fact CSI provides more thorough warnings in its 2001 and 2004 MSDS does not further Mr. Brown's concert of action theory against Arch and Osmose for warnings they issued in 1992 and 1994 respectively.

untreated wood. [Deposition of Robert Gruber, Docket No. 178-13, at pg. 20-21]. He explained the statement refers generally to the handling of wood, treated or untreated. [*Id.* at pgs. 21, 51].

Mr. Brown asserts that Arch's and Osmose's use of the same language in their warning regarding splinters, which he contends constitutes a "half-truth," demonstrates "obvious concert of action." [Docket No. 168, pg. 15]. The Court disagrees. Plaintiff has not pointed to any testimony or documents from which a reasonable inference can be made that Arch and Osmose had any collaboration with respect to the warning they provided regarding splinters; let alone that such collaboration was a joint effort to conceal the dangers of arsenic in the splinters. Concert of action requires more than parallel or imitative activity. Brown is required to put forth some evidence that these Defendants acted in some cooperative or concerted manner and these documents do not meet that burden. *See Dawson,* 1988 WL 123929, at *2 (granting summary judgment finding "plaintiffs have not shown the court any memorandum, any letter, any shred of an agreement that would imply the defendants cooperated or acted in concert.").

Similarly, Mr. Brown's reference to a September 20, 1993, letter from John Butala to Dr. Dale Hooper [Docket Nos. 168-12, 170-1] does not evidence Arch and Osmose had an agreement, or otherwise acted cooperatively, to conceal the hazard of arsenic in splinters from CCA-treated wood.[19] [Docket No. 168, pgs. 16-18]. At most, Mr. Brown's assertions

_____

[19] In this letter, Mr. Butala states he is following up with Dr. Hooper regarding their conversation about one of Dr. Hooper's patients who suffered from multiple-site ulcerative lesions on his lower leg who

regarding this letter suggest Mr. Butala was hired by Arch to respond to Dr. Hooper regarding his report of a complaint of a splinter injury by one of Dr. Hooper's patients. Plaintiff suggests in his Response that Mr. Butala intentionally concealed the fact he was hired by Arch when responding to Dr. Hooper. Plaintiff also finds of import that Mr. Butala's letterhead contains contact information that suggests he is writing from the School of Pharmacy at Duquesne University, but yet the telephone and fax numbers provided on the letterhead match those provided on his curriculum vitae for his business, Toxicology Consultants, Inc.

Even assuming Mr. Butala intentionally concealed that he had been hired by Arch to provide information to Dr. Hooper regarding the health effects of CCA, this letter does nothing to advance Mr. Brown's argument that Arch and Osmose acted in concert to hide the dangers of arsenic in splinters from CCA-treated wood. Plaintiff does not assert that Osmose had any involvement in the representations made by Mr. Butala. Nor does Plaintiff argue Arch and Osmose had an agreement on how to respond to such inquiries. Instead, Plaintiff argues that Arch's and Osmose's "half-truth" that "handling can cause splinters" was exacerbated by Arch's strategy in responding to complaints of splinter injuries. Mr. Brown's

---

also has a history of getting a splinter from CCA-treated wood five years earlier. [Docket No. 170-1]. Mr. Butala explains in his letter that "all indications to date from both human experience and controlled laboratory studies show without exception wood properly treated with CCA-C does not produce effects that can be produced by the pesticide used to treat the wood." Mr. Butala explains a critical feature of CCA-treated wood is fixation and that an important feature of fixation is that once the "preservative metals are effectively bound in wood fiber they are not available for biological absorption by the user of the wood no matter how intimate [the] contact with treated wood may be." [*Id.* at pg. 1-2]. He also states that as they discussed, he considered a hypothetical arsenic dose delivered in a wood splinter assuming a total failure of fixation, and determined the exposure would be equivalent to a normal daily dietary intake of arsenic.

reference to this letter simply does not advance his theory that Arch and Osmose acted in concert.

         **c.**     **Mr. Brown has not demonstrated that Arch and Osmose acted in concert in their communications to the EPA in 1977 of there being no reports of adverse effects having been caused by the arsenic in CCA-treated wood.**

Without specific discussion of concert of action, Mr. Brown argues that Arch and Osmose were both involved in a 1977 filing with the EPA that stated there had been no reports of adverse effects from the arsenic used in wood preservatives when, in fact, reports of adverse effects had been made. [Docket No. 168, pgs. 24-25]. Mr. Brown specifically references a 1977 memorandum filed with the EPA by the Environmental Programs Task Group, Subcommittee No. 1 of AWPI (the "Committee").[20] The memorandum identifies the members of the Committee and indicates that both Arch's predecessor, Koppers Company, and Osmose had at least one representative on the Committee at the time of the 1977 filing. [Docket No. 168-24, pg. 7 (Koppers Company had two representatives: Mr. Robert Arsenault and Mr. Gerald Daugherty; Osmose had one representative: Mr. George Fahlstrom)]. In the memorandum, the Committee stated that "[i]norganic pentavalent arsenical compounds of varying formulation have been used as wood preservatives in substantial quantities for more than 35 years with no reports of adverse effects." [Docket No. 168-24, pg. 9].

---

[20] The memorandum states it "is responsive to the EPA's request for environmental information relevant to the reregistration of arsenical wood preservatives." [Docket No. 168-24, pg. 8].

Mr. Brown argues there is evidence to refute the representations made to the EPA in the Committee's memorandum. He appears to be arguing that both Koppers Company and Osmose were aware at the time the memorandum was filed with the EPA that reports of adverse effects from exposure to CCA-treated wood had, in fact, been made. Specifically, Mr. Brown points to a July 25, 1977, "memo to file" from Robert Arsenault, a former employee of Koppers Company who was on the Committee in 1977. [Docket No. 168-25]. Mr. Arsenault's "memo to file" outlines three incidents of CCA dust toxicity that had been reported to him involving workers who were exposed to CCA dust through sawing, sanding or planing the material. [Docket No. 168-25]. Mr. Brown emphasizes that this "memo to the file" predates the August 1977 memorandum from the Committee filed with the EPA. He does not, however, point to any evidence that suggests Mr. Arsenault informed the Committee, his employer, or someone at Osmose of this information.

Mr. Brown also points to a December 7, 1989, Indiana Supreme Court decision as support for his position that there is evidence refuting the Committee's 1977 representation to the EPA of no reports of adverse effects from the arsenic in CCA-treated wood. [Docket No. 168, pg. 25 (quoting *Sipes v. Osmose Wood Preserving Co. of Am.*, 546 N.E.2d 1223, 1225 (Ind. 1989)]. In *Sipes*, the Indiana Supreme Court reversed the trial court's grant of "judgment on the evidence" to Osmose on the issue of punitive damages, not concert of action, finding the plaintiff had presented sufficient evidence to go to the jury on the issue. *Sipes,* 546 N.E.2d at 1225. While the Court in *Sipes* discussed several pieces of evidence

31

presented in that case on the issue of punitive damages against Osmose, Mr. Brown focuses on the Indiana Supreme Court's discussion of two instances involving injury to people working with CCA-treated wood that he asserts were known to Gerald Daugherty, a former employee of both Koppers Company and Osmose. [Docket No. 168, at 25].

Mr. Brown does not provide any argument, however, as to how Mr. Daugherty's knowledge of these two incidents furthers a concert of action theory in this case. Assuming Mr. Brown is pointing to the *Sipes* decision for the purpose of demonstrating that Osmose also had knowledge of at least one of the incidents described in Mr. Arsenault's "memo to file" at the time the Committee filed its 1977 memorandum with the EPA, Plaintiff does not cite to where the evidence presented in *Sipes* is contained in the record here.

Further, to the extent Mr. Brown may be arguing that because former Osmose employee Gerald Daugherty had knowledge of at least one of the incidents described in the Arsenault "memo to file," it can be inferred that Koppers Company and Osmose acted in concert by way of their involvement in the Committee's 1977 memorandum filing, this argument fails. Plaintiff's own briefing states Mr. Daugherty worked for Koppers Company, not Osmose, at the time of the 1977 filing. [Docket No. 168, pg. 25 ("Gerald Daughtery [sic] [] formerly worked for Koppers Co. and in 1981 was employed by Osmose")]. In addition, the Committee's 1977 memorandum identifies Mr. Arsenault and Mr. Daugherty as being representatives of Koppers Company, not Osmose. [Docket No. 168-24, pg. 7].

Thus, what Mr. Daugherty knew in 1977 about reports of adverse effects of CCA-treated wood does not demonstrate Osmose had any knowledge in 1977 of those reports, and Plaintiff has not pointed to any other evidence in this case that demonstrates Osmose or the Committee had such knowledge at the time of the Committee's 1977 EPA filing. Accordingly, the Court rejects any argument that the 1977 memorandum of the Committee evidences that Arch and Osmose, through their representatives on the Committee, acted in concert to conceal the hazard of arsenic in CCA-treated wood.

> **2.** **Plaintiff has not pointed to evidence that demonstrates Arch, Osmose and CSI acted in concert to conceal the hazards of arsenic in CCA-treated wood by their involvement in an administrative challenge to an EPA proposal requiring warning labels on pressure-treated wood.**

Without specific argument as to how it supports his concert of action theory, Mr. Brown points out that Arch, Osmose and CSI were all petitioners in an administrative proceeding before the EPA. In that proceeding, they objected to the EPA's proposal to require warning labels on CCA-treated wood under the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA). According to Brown, they did so despite knowing that warning labels were necessary to protect users from injury.[21] [Docket No. 168, pg. 23 (citing *In re Chapman Chemical Co.*, FIFRA Docket No. 529 (1985)) and 168-21]. Mr. Brown explains the petitioners in the administrative proceeding successfully challenged the EPA's authority

---

[21] Plaintiff appears to contend these Defendants knew warning labels were needed to protect users because two lawsuits had already been filed alleging such at the time the administrative decision was entered. [Docket No. 168, pg. 23].

under FIFRA to require labels on CCA-treated wood. Mr. Brown contends the only reasonable inference from these Defendants' opposition to the EPA's proposal is that they knew the EPA's recommendation requiring warning labels on CCA-treated wood would "end the marketing" of their products. [*Id.*]. But to the extent Plaintiff is arguing that the involvement of these Defendant's in the administrative challenge is evidence they acted in concert to commit a tortious act, Brown has not pointed to any evidence that would reasonably lead to such an inference.

In *Stevens*, this Court rejected a similar argument and held the administrative case did not support a concert of action theory against the chemical manufacturers. Their mere involvement in the challenge did not indicate they had formed an agreement or acted in concert to prevent warning labels from being placed on the poles. *Stevens*, 2016 WL 5660362, at *11. Instead, the Court found the EPA administrative decision, at most, suggested the chemical-manufacturing defendants were involved in parallel activity to legally challenge the EPA's authority to regulate labeling of treated wood as part of its registration process. Mr. Brown has not argued that the reasoning in *Stevens* on this issue is incorrect and has not attempted to distinguish his argument from that presented in *Stevens*. The Court's reasoning in *Stevens* applies equally to the case at bar.[22]

---

[22] The only nuance in Mr. Brown's argument here that was not presented in *Stevens* is that he provided a "list of addressees" who received a copy of the administrative decision upon its issuance. The list includes, as well as dozens of others, persons identified as counsel for the chemical-manufacturing Defendants. In *Stevens*, plaintiff did not present evidence demonstrating that Arch and Osmose had any role in the administrative challenge.

As this Court explained in *Stevens*, it found another case from this district instructive. *Stevens*, 2016 WL 5660362, at *11 (citing *Smith*, 2013 WL 1136624, at *1). In *Smith*, the court dismissed a concert of action claim where plaintiffs alleged only that the defendants engaged in parallel activity to conceal the dangers of a chemical used in their products. The plaintiffs did not allege facts suggesting an agreement or common design between the defendants or demonstrating the defendants provided substantial assistance to others to commit a tortious act. *See Smith*, 2013 WL 1136624, at *1.[23]

This Court also found in *Stevens* that another case was persuasive on the issue. *Stevens*, 2016 WL 5660362, at 11 (citing *Rastelli v. Goodyear Tire & Rubber Co.*, 591 N.E.2d 222, 223-25 (N.Y. 1992)). In *Rastelli*, the appellate court held the trial court erred in not granting summary judgment to a manufacturer on concert of action based on parallel activities of defendants and other manufacturers directed to a government agency as well as lobbying efforts. *Rastelli v. Goodyear Tire & Rubber Co.*, 591 N.E.2d 222, 223-25 (N.Y. 1992) (citing Restatement (Second) of Torts § 876). There, a manufacturer of a multipiece tire rim that separated, explosively killing plaintiff's decedent, was held not subject to concerted action liability based on the defendant's and other manufacturers' lobbying efforts. Specifically, the plaintiff had alleged and submitted evidence that the rim manufacturers had:

---

[23] In *Smith*, the plaintiffs alleged the defendants acted in concert to conceal the dangers of the chemicals they made and sold to their employer without proper warning by: 1) substantially assisting the others' efforts to keep consumers ignorant of the dangers of the chemicals; 2) sponsoring its own misleading research about the chemicals' dangers to substantiate the other defendants' inadequate warnings; and 3) creating joint defense agreements and coordinating their responses to government agencies to "present false or misleading information about the health risks" of the chemicals. *Id.* at *1.

campaigned through their trade association for OSHA to make employers rather than manufacturers responsible for safe truck maintenance; decided not to issue warnings; successfully lobbied against a ban on production of multipiece rims; and declined to voluntarily recall the rims at issue. *Id.* The court found these activities were insufficient to support the plaintiff's claim of concert of action because plaintiff's evidence demonstrated only parallel activity by the rim manufacturers; it did not "raise an issue of fact as to whether the rim manufacturers were parties to an agreement or common scheme to commit a tort." *Id.* at 224-25.

Similarly here, Mr. Brown's citation to the administrative decision challenging the EPA's authority to require labeling on CCA-treated wood as a requirement for registration of the preservatives at issue under FIFRA does not evidence the chemical-manufacturing Defendants acted by agreement or common design. Further, even if these Defendants had pursued the administrative proceeding pursuant to an agreement or common design, the EPA administrative decision demonstrates a successful effort to legally challenge the EPA's exercise of unauthorized authority, which is not tortious activity. *See cf. Senart v. Mobay Chemical Corp.*, 597 F. Supp. 502 (D. Minn. 1998) (defendants' conduct in working to persuade OSHA to reject a proposal for more stringent exposure standards was not tortious, but "sought only permissible ends and acted only through permissible means," and was "clearly permissible" under the First Amendment right to petition). Thus, Mr. Brown's

citation to the administrative decision does not further his concert of action theory against the chemical-manufacturing Defendants.

### 3. Plaintiff has not presented evidence demonstrating "all Defendants" acted in concert to conceal the dangers of arsenic in CCA-treated wood.

Mr. Brown makes several conclusory statements that "all Defendants" knew and concealed the nature and extent of the hazards caused by exposure to the arsenic in the CCA-treated wood by, among other things, failing to affix warning labels to the utility poles. [Docket No. 168, pgs. 2-3, 7-9, 22]. Mr. Brown has failed, however, to support his argument with evidence demonstrating Defendants acted by agreement or common design. Accordingly, as explained more thoroughly below, Mr. Brown has failed to demonstrate a concert of action theory against "all Defendants."

First, Mr. Brown argues that despite "arsenic-treated wood" being a more accurate and descriptive term for CCA-treated wood, the Defendants identified their products using terms that concealed the existence of arsenic in the products: Wolmanized® wood (Arch), GreenWood™ (CSI) and Osmose brand pressure treated wood (Osmose). [Docket No. 168, pgs. 2, 6]. He also states that both Arch and Osmose used the term "salt-treated wood" to describe CCA-treated wood, which he contends is an "unprecedented misnomer in deceptive marketing," as the wood does not contain table salt, but a salt form of arsenic. [Id.]. However, even assuming all of the Defendants marketed their CCA-treated wood under names that did not identify arsenic as an ingredient of the CCA, Mr. Brown has not pointed

to evidence that demonstrates or supports a reasonable inference the Defendants did so because of an agreement or common design, let alone that such an agreement was for the purpose of concealing the dangers of arsenic. *See Dawson*, 1988 WL 123929, at *2 (granting summary judgment where plaintiffs did not "show[] the court any memorandum, any letter, any shred of an agreement that would imply the defendants cooperated or acted in concert."). Thus, this argument does not further his concert of action theory against all Defendants.

In addition, Mr. Brown references three documents he contends evidence the Defendants' "[s]tate of [m]ind" and that "[t]hey had a [d]uty to [c]ommunicate the [h]ealth [h]azards of [e]xposure to [i]norganic [a]rsenic."[24] [Docket No. 168, pgs. 18-19]. While not clear if Mr. Brown intends for these documents to be considered as evidence in support of his contention that the Defendants acted tortiously pursuant to an agreement or common design, they do not provide such support. Specifically, these documents do not evidence an agreement or common scheme among the Defendants.

Mr. Brown also argues the Defendants acted in concert to conceal the hazards of the arsenic in the CCA-treated wood by not referencing in their respective MSDS certain

_____

[24] Mr. Brown references an Amendment of Notice of Intent to Cancel Registrations, published in the Federal Register, wherein the EPA reports on its investigation of wood preservatives, including those using inorganic arsenicals. [Docket No. 168, pgs. 18-19 (citing Creosote, Pentachlorophenol, and Inorganic Arsencials; Amendment of Notice of Intent to Cancel Registrations ("Amended Notice"), 51 Fed. Reg. 1334-348 (Jan. 10, 1986)]. He also quotes from the Consumer Information Sheet (CIS) appended to the EPA's 1986 Amended Notice, which CIS warns that inorganic arsenic is in the treated wood and exposure may present certain hazards. He further points to a June 29, 2001, letter from the EPA to the president of AWPI that contains suggested changes to the CIS to include an additional warning that "some chemical may migrate from treated wood into surrounding soil over time and may also be dislodged from the wood surface upon contact with skin." [Docket No. 168-14, pgs. 6-9].

publications reporting adverse effects from exposure to CCA-treated wood and by failing to warn that burning CCA-treated wood converts the pentavalent arsenic to the more toxic trivalent arsenic. [Docket No. 168, pgs. 19-23]. Mr. Brown contends that because none of the Defendants provided this information/warning the "concert of action by all Defendants is self-evident." [*Id.* at pgs. 22, 23]. The Court disagrees. "[P]laintiff[] must show that the defendants acted by cooperative or concerted activities. Allegations of parallel activity or independent adherence to industry-wide standards will not meet this requirement." *See Dawson*, 1988 WL 123929, at **2-3 (granting summary judgment, finding plaintiff failed to present any evidence that would imply the defendants cooperated or acted in concert). Simply because none of the Defendants provided this information/warning to the end users does not in and of itself evidence concerted action. *Id.* Plaintiff has not pointed to any evidence that suggests the Defendants acted pursuant to an agreement or common scheme to exclude this information from their MSDS or other literature. He simply surmises that since none of them included the information/warning in their MSDS they must have acted in concert. Again, at most, this would suggest parallel activity, which is insufficient to establish concert of action. *See Smith*, 2013 WL 1136624, at *5 (citing *Dawson*, 658 F. Supp. at 1040).

Plaintiff's reliance on *Sipes*, 546 N.E.2d at 1225, does not further his argument that all Defendants acted in concert. *Sipes* involved the issue of whether under Indiana's rules of trial procedure the trial court properly granted a "motion for judgment on the evidence"

and dismissed plaintiff's punitive damages claim against Osmose. *Sipes* did not involve a finding that Osmose acted in concert with other chemical-manufacturers or wood-treaters. The court in *Sipes* found the evidence was sufficient to present a jury question on whether, under Indiana law, the necessary elements for an award of punitive damages against Osmose had been shown. This conclusion by the *Sipes* court, based upon the circumstances presented there, does nothing to further an argument here that such evidence is sufficient to present a jury question on the issue of concert of action.

Lastly, Mr. Brown refers the Court to a 1981 Response of AWPI to the EPA's proposal under the Toxic Substances Control Act to require warnings with respect to the use of treated wood products. [Docket No. 168, pgs. 25-26 and 168-27]. While not clear, Mr. Brown appears to contend that AWPI knowingly made a false statement in this Response when it stated "there is no evidence of any significant adverse effects from burning treated wood." [Docket No. 168-27, pgs. 11-12]. He further contends this statement was "amplified" by other statements indicating the problem the EPA was seeking to address was merely esthetic and not a health issue.[25] Mr. Brown contends that a reasonable inference from these statements establishes that "Defendants knew and concealed the fact that burning

---

[25] He argues AWPI "amplified" this statement by also stating in its submission that "[b]ecause of the smoke and smell it only rarely would be used as firewood. The problem aimed at by the EPA's warning on burning is an esthetic rather than a health issue." [Docket No. 168, pg. 26 (quoting Docket No. 168-27, pg. 13)]. He contends AWPI's position that burning CCA-wood is an esthetic problem because it smells bad is "outside the boundary of acceptable conduct." *Id.*

[CCA-]treated wood converts the pentavalent arsenic to trivalent arsenic, which is more hazardous than pentavalent arsenic." [*Id.*].

However, even assuming AWPI had knowledge of adverse effects from burning CCA-treated wood at the time it made its 1981 submission to the EPA, Plaintiff has not identified evidence of an agreement among the Defendants to conceal the health effects from burning CCA-treated wood. The fact that the Defendants may have all belonged to the same trade association is not sufficient to support a concert of action claim. Instead, the Plaintiff must point to evidence from which it can reasonably be inferred that the Defendants acted by agreement to commit a tortious act. *See Eastridge*, 2014 WL 4916236, at *4. Other than inferring Defendants were members of AWPI at the time of the 1981 Response, Mr. Brown has not pointed to any evidence that any of the Defendants participated in developing or were otherwise involved in AWPI's Response to the EPA proposal. Mere membership in the same trade group does not demonstrate concert of action. *Id.; Rastelli*, 591 N.E.2d 224-25 (finding allegations and exhibits demonstrating that trade association campaigned for OSHA to place responsibility for safety precautions on maintenance employers and not the manufacturers was not sufficient to raise issue of fact as to whether rim manufacturers were parties to an agreement or common scheme to commit a tort). Accordingly, Plaintiff's reference to AWPI's Response to an EPA proposal regarding warnings for treated wood products does not further a concert of action theory against the Defendants.

Mr. Brown does not point to any other evidence that he contends demonstrates a concert of action theory against "all Defendants." Because none of the evidence he points to demonstrates the Defendants acted cooperatively or in concert to carry out a tortious act or provided substantial assistance to others to accomplish a tortious act, he cannot proceed under a concert of action theory. *See Dawson*, 1988 WL 123929, at *3 (granting summary judgment, finding "plaintiffs have not shown the court any memorandum, any letter, any shred of an agreement that would imply the defendants cooperated or acted in concert").

## III.   CONCLUSION

Mr. Brown has not presented any evidence to support a reasonable inference that he was exposed to any of the Defendants' products specifically. In addition, his effort to demonstrate a concert of action theory against the Defendants fails because he has not pointed to any evidence that demonstrates the Defendants, in any combination, acted in concert or pursuant to a common design to carry out a tortious act or that they provided substantial assistance to others to accomplish a tortious act as is necessary to maintain such a theory.

For these same reasons, Mr. Brown cannot prevail on his summary judgment motions. Mr. Brown sought summary judgment on two issues: that he suffered cacosmia as a result of his exposure to the arsenic in the CCA-treated utility poles on which he worked; and that Arch and Osmose failed to warn of the hazards caused by splinters from wood treated with the chemical. [Docket Nos. 154 and 157]. Unable to demonstrate that he was exposed to any

of the Defendants' specific products or that he has a viable concert of action theory, Mr. Brown cannot prove any of the Defendants' products caused his cacosmia or that he was harmed by any deficiency in Arch's and/or Osmose's warnings regarding splinters, which is required to prevail on these Motions. Accordingly,

**IT IS ORDERED** that:

1.     Defendants' Motion for Summary Judgment on Product Identification [Docket No. 159] is **SUSTAINED**;

2.     Plaintiff having failed to demonstrate a prima facie element of his case sufficient to survive summary judgment, all other pending Motions [Docket Nos. 154, 157, 160, 161, 162, 163, 164, 165, 189] are **OVERRULED AS MOOT**; and

3.     Judgment is entered in Defendants' favor and this matter is **stricken** from the active docket of the Court.

Dated this 25ᵗʰ day of September, 2017.



Signed By:
*Henry R. Wilhoit, Jr.*
United States District Judge

C:\Users\Benu Rellan\AppData\Local\Temp\notes24E014\13-61-HRW MOO3.final.wpd